## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 12 CR 629 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| VIVEK SHAH ) | |

## VIVEK SHAH'S MOTION TO
## TERMINATE SUPERVISED RELEASE

Defendant, VIVEK SHAH, by the Federal Defender Program and it's attorney, ROBERT D. SEEDER , respectfully requests this Court terminate Mr. Shah's supervised release pursuant to 18 U.S.C. § 3583(e)(1). The Probation Office supports this request. In support of this request, Mr. Shah states as follows:

1. On September 12, 2013, Mr. Shah was sentenced by Judge Irene C. Berger of the Southern District of West Virginia after pleading guilty to one count of transmitting a threat in interstate commerce with intent to extort money in violation of 18 U.S.C. § 875(b), and seven counts of mailing threatening communications, in violation of 18 U.S.C. § 876(b). Mr. Shah was sentenced to 87 months of imprisonment, followed by three years of supervised release. At the time of his sentencing, Mr. Shah's criminal history was a Category I.

2. Jurisdiction of this matter was transferred to the Northern District of Illinois and the case was assigned to this Court on April 22, 2019.

3. Mr. Shah began his supervised release period on February 4, 2019. His supervision is currently set to expire on February 3, 2022. Mr. Shah is currently supervised by U.S. Probation Officer Ron Jacobs. USPO Jacobs has informed counsel

that Mr. Shah has been completely compliant with all of his supervisory conditions. Mr. Shah has not had any positive drug tests or missed any drug tests while on supervision. He has attended all of his meetings, and submitted all requested documents in a timely fashion. Mr. Shah has not had any further contacts with the criminal justice system. He has no outstanding financial obligations in regard to his supervision, having paid his $800 special assessment.

Additionally, while on supervised release, Mr. Shah was granted permission by the Court to travel internationally to India, Peru, and Zimbabwe to visit family, and pursue business opportunities. Mr. Shah previously lived in India from 1993-2002. Mr. Shah complied with all of the Court's directives relating to the planned travel, which included providing his itinerary and contact information to the probation office, as well as informing his probation officer upon his return to the United States.

4. Since being released from prison, Mr. Shah has maintained steady employment. He currently works full-time as a driver for Uber and Lyft. He has driven more than 15,000 miles as an Uber and Lyft driver. Mr. Shah is also an actor, and has appeared in commercials, as well as in television and theatrical releases, in small parts. He recently signed with a theatrical agency in Los Angeles in an effort to advance his acting career. During his first year on supervision, Mr. Shah lived with his parents in Schaumberg, Illinois.  In January, 2020, because of his successful performance on supervision, USPO Jacobs permitted Mr. Shah to relocate to Los Angeles to pursue his acting career. In Los Angeles, January is known as an extremely busy time of the year when pilots for potential television programs are being cast and filmed for the following

season. Allowing Mr. Shah to reside there at this time of year provides him a greater opportunity to advance his acting career.

Mr. Shah has also developed an app for Uber and Lyft drivers called DriverChatter. It permits drivers who work for those companies to communicate with each other while working to discuss issues that surface in that industry, as well as provide information regarding road conditions or helping locate other drivers for customers seeking assistance.

5. One of the main reasons Mr. Shah is seeking early termination of his supervised release is his plan to market the DriverChatter app. He is hoping to directly market the app to drivers at airports in cities around the country by providing drivers in Uber/Lyft airport queues written information as to the app and its uses. That is the only method that is available to him in reaching the base of people to whom he could market the app. That marketing approach, which he deems necessary to increase the success potential of the app, would require frequent travel outside of his supervision district. Being free of supervision requirements, which he has demonstrated and the probation office agrees, are no longer necessary, would allow him a greater opportunity of finding success in this business venture.

6. This Court has discretionary authority to terminate supervised release after a defendant has completed one year of the total term "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). At the time of the hearing on this motion, Mr. Shah will have completed one year of his three year term without any issues whatsoever while on supervision and without having any financial obligation emanating from this case.

Terminating his supervised release will allow Mr. Shah to move onto the next stage of his professional and personal life.

7. One additional consideration for the Court to utilize in its determination of this request is the uncontroverted fact that Mr. Shah overserved his sentence of imprisonment because of changes in good time credit brought on by the First Step Act. While still serving his term of incarceration in December 2019, Mr. Shah filed a pro se emergency temporary restraining order (TRO) requesting his immediate release from halfway house custody based on the changes in good time credit enacted under the First Step Act.

Emergency U.S. District Court Judge Sharon Johnson Coleman, on January 3, 2019, denied the TRO request, while acknowledging that she was not "unsympathetic to Petitioner's argument that he would be entitled to his immediate release if the First Step Act was immediately implemented". The TRO was denied because the First Step Act statute permitted the Attorney General and the Bureau of Prisons additional time to complete a needs assessment and recalculation of good time credit for inmates. Judge Coleman also found that Mr. Shah had not exhausted administrative remedies available to him. (See Attachment A, January 3, 2019, Order by U.S. District Court Judge Sharon Johnson Coleman; 18 C 7990 Dkt. # 2, at p. 1-5).

Importantly, in her order, Judge Coleman specifically noted that "overincarceration carries a great weight in a motion to modify supervised release under 18 U.S.C. § 3583(e)", citing *Pope v. Perdue*, 889 F. 3d 410, 418 (7th Cir. 2018). Significantly, the Seventh Circuit has also stated that when a former inmate still serving a term of supervised release challenges the length or computation of his sentence, his

case is not moot as long as he could obtain "any potential benefit" for a favorable decision. *United States v. Trotter*, 270 F.3d 1150, 1152 (7th Cir. 2001).

While Mr. Shah was unable to secure immediate release, where it was clear based on changes to the calculation of good time credit, that he had served more time than necessary to fulfill his sentence, the Seventh Circuit along with Judge Coleman have made it clear that overservice of a prison sentence can be considered in determining a request for modification or early termination of supervision. While Mr. Shah's overservice of sentence may have resulted in approximately 50 days of extra prison time, it is impossible to quantify what even an extra day of unwarranted incarceration equals in terms of freedom.

8. Because Mr. Shah is not at risk of reoffending, the resources of taxpayers and the probation office should not be further spent on him. He is an excellent candidate for early termination of supervised release and is a productive and law-abiding member of society. The scarce and valuable resources of the United States Probation Office would be better used on other individuals in need of court supervision.

9. A Pew study supports Mr. Shah's request. The study documents the record number of individuals now on federal supervised release (115,000 in 2017, almost three times more than in 1995). The study reached a key conclusion that "policymakers can maximize limited resources and maintain public safety by reducing the length of supervision for certain offenders and prioritizing oversight and services for those most likely to reoffend." See Pew Charitable Trusts, Number of Offenders on Federal Supervised Release Hits All-Time High (Jan. 24, 2017), available at http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2017/01/number-of-

offenders-on-federal-supervised-release-hits-all-time-high. With Mr. Shah, this Court can indeed maximize resources while still maintaining public safety as Mr. Shah has demonstrated that he is no risk to the public.

10. Mr. Shah's supervision probation officer, Ronald Jacobs, does not object to this motion for early termination of supervised release.

WHEREFORE, for the reasons stated above, Mr. Shah respectfully requests that this Court grant his motion for early termination of supervised release.

                                            Respectfully Submitted,

                                            FEDERAL DEFENDER PROGRAM
                                            John F. Murphy, Executive Director
                                            <u>By: /s/ Robert D. Seeder</u>

ROBERT D SEEDER
Federal Defender Program
55 E. Monroe Street
Suite 2800
Chicago, IL 60603
(312) 621-2034

## CERTIFICATE OF SERVICE

The undersigned, Robert D. Seeder, an attorney with the Federal Defender program hereby certifies that in accordance with FED.R.CRIME. P. 49, Fed.R.Civ. P. 5, LR.5.5, and the General Order of Electronic Case Filing (ECF), the following document(s):

**VIVEK SHAH'S MOTION TO TERMINATE SUPERVISED RELEASE**

Was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on January 27, 2020, to counsel/parties that are non-ECF filers.

By: /s/ *Robert D. Seeder*
ROBERT D. SEEDER
Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, IL 60643
(312) 621-2034

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Vivek Shah, <br><br> Petitioner, <br><br> v. <br><br> Richard Hartman, <br> Director of Salvation Army Freedom Center, <br> Pathway Forward, <br><br> Respondent. | Case No. 18 C 7990 <br><br> Judge Sharon Johnson Coleman |

## ORDER

Petitioner's emergency motion for a temporary restraining order seeking his immediate release [6] is denied.

## STATEMENT

Petitioner Vivek Shah, a federal prisoner presently incarcerated at a halfway house in Chicago, Illinois, brought this *pro se* habeas corpus petition under 28 U.S.C. § 2241 challenging his criminal conviction from the United States District Court for the Southern District of West Virginia. In 2013, Petitioner pled guilty to one count of transmitting in interstate commerce a threat with intent to extort in violation of 18 U.S.C. § 875(b), and seven counts of mailing threatening communications in violation of 18 U.S.C. § 876(b). *Shah v. United States*, No. 5:15-cv-7542, 2017 WL 3168425, at *1 (S.D.W. Va. July 26, 2017). He was sentenced to a term of 87 months of imprisonment followed by a three-year supervised release term. *Id.* His habeas corpus petition challenges the underlying merits of his criminal convictions. (Dkt. 1.)

This case is assigned to the Honorable Gary Feinerman. On December 22, 2018, Petitioner filed an emergency temporary restraining order (TRO) seeking his release from his halfway house based upon Congress' recent passage of the First Step Act of 2018, Pub. L. No. 115-015, 132 Stat. 015 (2018), on December 20, 2018. (Dkt. 6.) The Court is presiding over this motion in its capacity as the Emergency Judge. The Court heard oral argument from Petitioner and an Assistant United States Attorney on the motion on January 3, 2019. Although Petitioner appeared *pro se*, he was well-prepared and offered a number of nuanced and well-crafted arguments in support of his position.

When considering a request for a TRO, the Court applies the same standard used for evaluating a motion for a preliminary injunction. *Carlson Group Inc. v. Davenport*, No. 16 CV 10520, at *2 (N.D. Ill. Dec. 13, 2016) (St. Eve, J.). A TRO is an "'extraordinary remedy [that is]

never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008)). To obtain relief, Petitioner must demonstrate: (1) likelihood of success on the merits; (2) demonstrate that he will suffer irreparable harm without the requested relief; and, (3) demonstrate that the equities balance in his favor, and that the award of relief is in the public interest. *Benisek*, 138 S. Ct. 1942, 1943-44 (citing *Winter*, 555 U.S. at 20, 32).

A federal prisoner claiming that he is being denied the proper application of good conduct credits can bring a section 2241 habeas corpus petition. *Waletzki v. Keohane*, 13 F.3d 1079, 1080 (7th Cir. 1994). However, Petitioner cannot demonstrate a likelihood of success on the merits, and so cannot obtain a TRO.

Petitioner's TRO involves the First Step Act's clarification of 18 U.S.C. § 3624(b). Prior to the enactment of the First Step Act, a federal prisoner could earn up to 54 days of credit for each year incarcerated for good behavior. 18 U.S.C. § 3624(b). The Bureau of Prisons calculated the good conduct earned based on actual time served in prison, not the length of the imposed prison sentence. *Barber v. Thomas*, 560 U.S. 474, 476-79 (2010). The result is that prisoners effectively earned 47 days per year of good conduct credit instead of a full 54 days. *Id.* The reason for the effective reduction to 47 days is that the prisoner was unable to earn a full year's worth of good conduct credit in his final year of incarceration assuming it is a partial year of confinement. *Id.* Legal challenges to the Bureau of Prisons' implementation of § 3624(b) have been previously rejected. *Barber*, 560 U.S. at 492 (upholding Bureau of Prisons' awarding of good conduct credit based on actual time served in prison instead of length of imposed sentence); *White v. Scibana*, 390 F.3d 997, 1003 (7th Cir. 2004) (same).

The First Step Act reverses the Bureau of Prisons' implementation by amending section 3624(b). Section 3624(b) previously stated that a "prisoner who is serving a term of imprisonment of more than one year [] may receive credit toward the service of the prisoner's sentence, ***beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment,*** beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b) (emphasis added).

The First Step Act amends section 3624(b) to read a "prisoner who is serving a term of imprisonment of more than one year [] may receive credit toward the service of the prisoner's sentence ***of up to 54 days of each year of the prisoner's sentence imposed by the court*** beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." First Step Act of 2018, Pub. L. No. 115-015, 132 Stat. 015 § 102(b)(1)(A) (2018).

Petitioner asserts that he contacted the Bureau of Prisons Designation and Sentence Computation Center in Grand Prairie, Texas, by telephone on December 21, 2018, to inquire about the implementation of the Act. He was told that the recalculation of his release date was not yet complete, and tat the Bureau of Prisons was "waiting on a directive" regarding how to proceed under the new Act. (Dkt. 6, pg. 3.)

The plain language of the First Step Act's amendment to section 3642(b) makes clear Congress' intent to reject the Bureau of Prisons' prior implementation of good conduct credit based on actual time served, and to instead adopt the contrary position that good time credit is earned based on the imposed sentence length. In sum, Congress is instructing that federal prisoners are eligible to earn a full 54 days of good conduct credit per year, not the 47 days that resulted under the Bureau of Prisons' policy.

Petitioner argues that under the old Bureau of Prisons policy, he is set for release from his halfway house on February 4, 2019. However, under the amendment passed by the First Step Act, Petitioner asserts he is entitled to additional good conduct credit, which would result in his immediate release from his halfway house and placement onto supervised release.

Petitioner, however, cannot obtain relief under the Act at this time. Section 102(b) of the First Step Act states that the amendment to section 3624(b) does not take effect until after the Attorney General completes and releases the needs assessment system established under section 101(a) of the Act. First Step Act of 2018, Pub. L. No. 115-015, 132 Stat. 015 § 102(b)(2) (2018). The Attorney General is given up to 210 days to implement the risk and needs assessment system. First Step Act of 2018, Pub. L. No. 115-015, 132 Stat. 015 § 101(a) (2018).

The government, at oral argument, asserted that the amendment to section 3624(b) is not yet in effect because the Attorney General has not yet completed and released the needs assessment system. The Court agrees with the government. The plain language of section 102(b)(2) of the Act is clear that the entirety of section 102(b), including the amendment to section 3624(b), is not effective until the Attorney General completes and releases the risk and needs assessment system under section 101(a) of the Act. The Act gives the Attorney General up to 210 days to complete the task. Less than two weeks have elapsed since the Act's passage. Consequently, pursuant to section 102(b)(2), the amendment to section 3624(b) set forth in section 102(b)(1)(A) is not yet in effect and so Petitioner is not yet entitled to relief.

Petitioner argued at oral argument that the delay in implementation under section 102(b)(2) does not apply to the amendment to section 3624(b) under section 102(b)(1)(A) because the Attorney General's risk and needs assessment system addresses matters unrelated to the awarding of sentencing credit. There are two problems with this argument. First, section 102(b)(2) is clear that it covers section 102(b)(1)(A)'s implementation as it applies to the implementation of all of section 102(b). Second, contrary to Petitioner's position, the risk and needs assessment system does involve sentence calculation to the extent that the system must "determine when a prisoner is ready to transfer into prelease custody or supervised release in accordance with § 3624." First Step Act of 2018, Pub. L. No. 115-015, 132 Stat. 015 § 101(a) (2018).

Petitioner also argues that the Court should apply the rule of lenity. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.'" *Barber*, 560 U.S. at 488 (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)). There is no ambiguity in the First Step Act. Congress chose

to delay the implement of its amendment to section 3624(b) until the Attorney General completed the risk and needs assessment system.

Petitioner's final argument is that he is in a fundamentally unfair situation. He claims that there is no dispute that he will receive the benefit of the First Step Act's amendment to award additional good conduct credits, but that by the time the Act is implemented he will be unable to receive that benefit because he will have already been released from his halfway house. At oral argument, Petitioner compared his situation to a person receiving a government financial subsidy. Petitioner argued that his hypothetical individual can be made whole at a later date by a retroactive financial payment. Petitioner counters that he cannot be made whole by the failure to award good conduct credits because his term of incarceration cannot be reduced once he has already been released.

This Court is not unsympathetic to the apparent inequity of Petitioner's situation. This Court, however, is obligated to apply the law as it is written. Congress chose to delay the implementation of the First Step Act's amendments until the Attorney General could complete the risk and needs assessment. The Court has no power to rewrite or disregard the statute in order to accommodate Petitioner's situation.

Finally, the government contends that the Petitioner has not exhausted his claim. An individual in custody must properly exhaust his claims before raising them in a 28 U.S.C. § 2241 habeas corpus petition. *Richmond v. Scibana*, 387 F.3d 602, 604 (7th Cir. 2004). The Bureau of Prisons has an established grievance process, the Administrative Remedy Program, for review of any aspect of a prisoner's confinement. *Tylman v. Roal*, No. 12-CV-0863-DRH, 2013 WL 171073, at *3 (S.D. Ill. Jan. 16, 2013). This is a multi-step grievance process requiring the prisoner to first attempt informal resolution of the issue. *Id.* If unsuccessful, an individual in custody then files a BP-9 grievance form. *Id.* If unsatisfied with the answer to his grievance, the individual then appeals to the Regional Director using a BP-10 form, and unsatisfied with that step, the individual can bring the final step of appealing to the General Counsel with a BP-11 form. *Id.* The grievance process applies to both inmates and former inmates for issues that arose during their confinement. 28 C.F.R. § 542.10(b).

Petitioner has not taken any of the required grievance steps, and in addition, he has not provided the Bureau of Prisons time to adjudicate his claim. The First Step Act was passed on December 20th, and he filed his present emergency motion two days later on December 22nd. Petitioner's only effort was to place a phone call the Bureau of Prisons. He has therefore not completed the required exhaustion process.

When the question of exhaustion was raised at oral argument, Petitioner countered that exhaustion of claims in a habeas corpus petition is not statutory required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). This is a true statement, but it is unhelpful to Petitioner, as the federal courts apply the exhaustion requirement to § 2241 as a common law rule. *Richmond*, 387 F.3d at 604.

This, moreover, is a situation where the exhaustion requirement is eminently reasonable.

The Department of Justice and Bureau of Prisons are in the process of implementing a new statute. Congress has given the Executive Branch time for this implementation. It is reasonable to permit that implementation to occur, and to be challenging from within the Bureau of Prisons, before subjecting it to challenges in the federal courts. As mentioned above, the Court is not unsympathetic to Petitioner's argument that he would be entitled to his immediate release from his halfway house if the First Step Act had been immediately implemented, but Congress declined to require immediate implementation and this Court is powerless to alter that fact.

All, however, is not lost for Petitioner. Under his current sentence, Petitioner must serve three years of supervised release following his release from the halfway house. In the event that Petitioner elects to file a motion to modify his supervised release, the Court notes that "overincarceration carries great weight in a motion to modify supervised release under 18 U.S.C. § 3583(e)." *Pope v. Perdue*, 889 F.3d 410, 418 (7th Cir. 2018). Petitioner is advised that a motion to modify supervised release under 18 U.S.C. § 3583(e) must be made before his sentencing judge.

Petitioner's emergency temporary restraining order seeking his immediate release (Dkt. 6.) is accordingly denied. The underlying habeas corpus petition (Dkt. 1.) and associated motion for leave to proceed *in forma pauperis* (Dkt. 3.) shall remain pending for adjudication by Judge Feinerman in the first instance as those are not emergency matters. The Court's participation in this case as Emergency Judge is concluded.

Date: 1/3/2019                                     /s/Sharon Johnson Coleman
                                                   Sharon Johnson Coleman
                                                   U.S. District Court Judge